IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| CHARLES B. CLARKE, JR., | : | **PUBLISH** |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No.: 5:06-cv-403(CAR) |
| | : | |
| DERRICK SCHOFIELD et al., | : | |
| | : | |
| Defendants. | : | |

_____

**ROYAL, District Judge**

Defendants filed a consolidated motion to exclude the testimony of Plaintiff's expert, William S. Thompson, M.D.   After a careful review of the briefs and Dr. Thompson's deposition, the Court held a telephone conference with the parties to determine how the parties wanted to proceed.   The parties agreed that the Court could rule on the motion without an evidentiary hearing and without oral argument.   After a careful review of the pertinent portions of the record and relevant case law, the Court concludes that Defendants' motion should be **GRANTED,** and William Thompson, M.D. is **EXCLUDED** as an expert witness in this case.

*BACKGROUND*

Plaintiff Charles B. Clarke, Jr., individually and as administrator of the Estate of Charles B. Clarke III, filed a complaint pursuant to 42 U.S.C. § 1983 alleging that Defendants, various employees of the Georgia Department of Corrections, violated his son's constitutional rights during his incarceration in the Georgia prison system, specifically in Jackson, Georgia.   In his

1

individual capacity, Plaintiff seeks to recover compensatory damages for his son's wrongful death, punitive damages, and attorney's fees.  On behalf of the Estate, Plaintiff seeks to recover compensatory damages for his son's pain and suffering, medical expenses, and funeral and burial expenses.

Plaintiff's Complaint in pertinent part alleges that various Defendants violated Decedent's constitutional rights by beating him, which caused his death.  The Complaint alleges that the beatings occurred at the Georgia Diagnostic and Classification Center in Jackson, Georgia, (GD&CC) and that Decedent was placed in 5-point restraints.  Decedent died on April 19, 2005 at GD&CC.  An autopsy performed by Keith Lehman, M.D., showed that Decedent "died as a result of pulmonary thromboemboli representing a complication of deep venous thrombosis."  (See Autopsy Report dated 05/24/2005.)

## *LEGAL STANDARD*

Federal Rule of Evidence 702 governs the admissibility of expert testimony, and it states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Simply stated, under Rule 702, the trial court can admit relevant expert testimony only if it finds that: (1) the expert is qualified to testify about the matters he intends to address; (2) the methodology used by the expert to reach his conclusions is sufficiently reliable; and (3) the expert's testimony will assist the trier of fact, through the application of scientific,

technical, or specialized expertise, to understand the evidence or determine a fact in issue. McCorvey v. Baxter Healthcare Corp., 298 F.3d 1253, 1257 (11th Cir. 2002) (citing Maiz v. Virani, 253 F.3d 641, 664 (11th Cir. 2001)); J & V Dev., Inc. v. Athens-Clarke County, 387 F. Supp. 2d 1214, 1223 (M.D. Ga. 2005).

As the Supreme Court noted in Daubert v. Merrell Dow Pharmaceuticals, Inc., Rule 702 imposes a duty on trial courts to act as "gatekeepers" to insure that speculative and unreliable opinions do not reach the jury.  509 U.S. 579, 589 n.7 (1993); McClain v. Metabolife Int'l, Inc., 401 F.3d 1233, 1237 (11th Cir. 2005).  The gatekeeping requirement imposes a duty on the trial court to make certain that expert witnesses employ in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); Goebel v. Denver & Rio Grande W. R.R. Co., 346 F.3d 987, 992 (10th Cir. 2003).  The court's gatekeeping role is especially significant, since "the expert's opinion can be both powerful and quite misleading because of the difficulty in evaluating it."  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

To fulfill its role as a gatekeeper, the trial court must determine whether the expert has the requisite qualifications to offer his opinions.  Poulis-Minott v. Smith, 388 F.3d 354, 359 (1st Cir. 2004); Frazier, 387 F.3d at 1260-61.  The trial court must also "'conduct an exacting analysis' of the *foundations* of expert opinions to ensure that they meet the standards for admissibility under Rule 702." Frazier, 387 F.3d at 1260 (quoting McCorvey, 298 F.3d at 1257). Finally, the court must "ensure the relevancy of expert testimony," meaning that it must determine whether the testimony will assist the trier of fact.  Daubert, 509 U.S. at 591.

The court performs its gatekeeping role consistent with Rule 104(a), which commits

preliminary evidentiary questions to the court's decision, and which further empowers courts in answering these questions to rely on evidence without being constrained by the rules of evidence.[1]  Id. at 593.  In sum, in acting as a gatekeeper, the court must keep "unreliable and irrelevant information from the jury," because of its "inability to assist in factual determinations, its potential to create confusion, and its lack of probative value."  Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir. 1999).

Although Daubert involved scientific experts, the Supreme Court has made it clear that the strictures of Rule 702 and Daubert apply with equal force to non-scientific expert witnesses. See Kumho Tire, 526 U.S. at 147.  Also, in all cases the proponent of the expert witness bears the burden of establishing that the expert's testimony satisfies the qualification, reliability, and helpfulness requirements of Rule 702 and Daubert.  McClain, 401 F.3d at 1238 & n.2; Frazier, 387 F.3d at 1260.  Finally, "[a]ny step that renders the analysis unreliable renders the expert's testimony inadmissible."  Goebel, 346 F.3d at 992 (quoting Mitchell v. Gencorp, Inc., 165 F.3d 778, 782 (10th Cir. 1999)) (internal alterations omitted).

Beginning with the qualification requirement, the Eleventh Circuit has explained that "experts may be qualified in various ways."  Frazier, 387 F.3d at 1260-61.  Certainly, an expert's scientific training or education may provide one means by which an expert may qualify to give certain testimony; however, experience in a particular field may also qualify an expert to offer an opinion on a particular matter. Id.  Indeed, "experts come in various shapes and sizes," and,

---

[1]  In particular, Rule 104(a) provides:
> Preliminary questions concerning the qualification of a person to be a witness . . . shall be determined by the court . . . .  In making its determination, it is not bound by the rules of evidence except those with respect to privileges.

Fed. R. Evid. 104(a).

consequently, "there is no mechanical checklist for measuring whether an expert is qualified to offer opinion evidence in a particular field." Santos v. Posadas de Puerto Rico Assocs., 452 F.3d 59, 63 (1st Cir. 2006). In all cases the court must focus its inquiry on whether the expert has the requisite skill, experience, training, and education to offer the testimony he intends to introduce. Poulis-Minott, 388 F.3d at 359.

With respect to the reliability requirement, the Eleventh Circuit directs trial courts to assess "whether the reasoning or methodology underlying the testimony is . . . valid and whether that reasoning or methodology properly can be applied to the facts at issue." Frazier, 387 F.3d at 1262. This inquiry must focus "solely on the principles and methodology [of the experts], not on the conclusions that they generate." Daubert, 509 U.S. at 595; Goebel, 346 F.3d at 992.

Daubert offers four non-exclusive factors that courts may consider in evaluating the reliability of an expert's testimony: (1) testability; (2) error rate; (3) peer review and publication; and (4) general acceptance. 509 U.S. at 593-95; J & V Dev., Inc., 387 F. Supp. 2d at 1223. These four factors most readily apply in cases involving scientific testimony and may offer little help in other cases, particularly those involving non-scientific experts. See Kumho Tire, 526 U.S. at 150-52. Accordingly, these factors merely illustrate rather than exhaust the factors or tests available to the trial court. The trial court has "considerable leeway" in deciding which tests or factors to use to assess the reliability of an expert's methodology. Id.

The advisory committee notes for Rule 702 offer an additional list of factors or tests. These tests are:

> (1)     Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has developed his opinion expressly for purposes of testifying;

5

> (2)     Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion;
>
> (3)     Whether the expert has adequately accounted for obvious alternative explanations;
>
> (4)     Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting;
>
> (5)     Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.

Fed. R. Evid. 702, advisory committee's note (2000 amends).  Like the four Daubert factors, these factors do not comprise a definitive checklist, nor is any single factor dispositive of reliability; instead, the tests articulated in the advisory committee's notes merely illustrate the issues a court may consider in evaluating an expert's testimony.  See id.

Finally, for admission the expert testimony must assist the trier of fact.  Expert testimony assists the trier of fact "if it concerns matters that are beyond the understanding of the average lay person."  Frazier, 387 F.3d at 1262.  "[E]xpert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  Id.  Nor does expert testimony help the trier of fact if it fails to "fit" with the facts of the case.  McDowell v. Brown, 392 F.3d 1283, 1298 (11th Cir. 2004).  Expert testimony lacks "fit" when "a large analytical leap must be made between the facts and the opinion."  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 147 (1997).   "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Id.  Thus, the court may exclude otherwise reliable testimony if it does not have "sufficient bearing on the issue at hand to warrant a determination that it [is 'helpful' to the trier of fact]."  Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1121 (10th Cir. 2004).

At all times when scrutinizing the reliability and relevance of expert testimony, a court must remain mindful of the delicate balance between its role as a gatekeeper and the jury's role

as the ultimate fact-finder.  A district court's "gatekeeper role . . . is not intended to supplant the adversary system or the role of the jury."  Allison, 184 F.3d at 1311-12.  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are traditional and appropriate means of attacking shaky but admissible evidence."  Daubert, 509 U.S. at 596.  A court may not "evaluate the credibility of opposing experts" or the "persuasiveness of competing scientific studies"; instead, its duty is limited to "ensur[ing] that the fact-finder weighs only sound and reliable evidence."  Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK, Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003); Frazier, 387 F.3d at 1272.

### *DISCUSSION*

The wrongful death claim in this case turns on the issue of the cause of the cause of Decedent's death.  This case does not involve a question of diagnosis; it involves a question of determining the etiology, the cause, of the Deep Venous Thrombosis (DVT) from which blood clots embolized that killed Plaintiff's Decedent. Specifically, did the acts of various Defendants who allegedly beat Plaintiff's Decedent cause his death, or did he die of natural causes?  Also, where was the DVT in Decedent's body?

If Plaintiff cannot prove that Defendants injured Decedent's body on either the right calf or the left thigh and that this injury caused a DVT, Plaintiff cannot establish the requisite causation to prove the wrongful death claim. In other words, if Plaintiff cannot prove the etiology of Decedent's DVT, he cannot prove his case.  Dorland's Illustrated Medical Dictionary defines "etiology" as "the study or theory of the factors that cause disease and the method of their introduction to the host; the causes or origin of a disease or disorder." 627 (29th Ed. 2000).

In analyzing Plaintiff's expert's opinions, the Court first notes that Plaintiff's expert and

Defendants' two experts agree on some key medical issues.  They agree that Decedent developed a DVT and that part of the thrombus from the DVT broke off forming pulmonary emboli (PE) that clogged his pulmonary arteries and killed him.  Thus, they do not dispute the immediate or direct cause of death, the PE,  nor do they dispute that Decedent had a DVT, although the location of the DVT remains a key question, at least for one of Dr. Thompson's theories. Furthermore, Dr. Thompson specifically agreed with Dr. Lehman's autopsy finding that Decedent had an acute thrombosis of large veins within the right calf.  (Thompson,  p. 240). Finally, the experts agree that Decedent had an acute DVT and that it had developed within three days—it was fresh.  (Thompson, pp. 262-63).

Next, the Court notes that this case does not involve questions about the diagnosis and treatment of DVT or PE.  Plaintiff's Complaint does not assert a medical malpractice claim involving a medical standard of care, nor does Dr. Thompson offer standard of care testimony. The defendants who allegedly beat Decedent and caused the DVT are not doctors or other medical providers.

Moving forward, but before beginning the analysis of Dr. Thompson's opinions, the Court will clarify some medical terms and the actual medical event that caused Decedent's death. A deep vein thrombosis occurs when a blood clot forms in a large vein not typically near the surface of the body.  (Lehman, p. 6).  Ninety-five percent of DVTs start in the calf.  (Thompson, p. 344). As the clot that makes up the DVT enlarges, it extends or moves up the vein in the leg. Part of the clot can break off—embolize—and plug up the major arteries that supply blood to the lungs.  This embolization or breaking off of part of the DVT, called  pulmonary emboli or thromboemboli, caused Decedent's death.  (Sperry, p. 20).

8

### *Dr. Thompson's Credentials*

Now the Court will consider Dr. Thompson's credentials as an expert witness consistent with the Fed. R. Evid. 702 requirement that an expert have "knowledge, skill, experience, training, or education" to offer an expert opinion in a case. To put this issue in the proper perspective, the Court will briefly outline Dr. Thompson's two opinions that support Plaintiff's wrongful death claim.  In examining the sufficiency of his credentials to offer these opinions, the Court will keep in mind "*the particular matter to which the expert testimony was directly relevant*" rather than his credentials in general.  Kuhmo Tire, 526 U.S. at 153-54  (emphasis in original).

Dr. Thompson's first theory involves the formation of a DVT in Decedent's right calf, the location of the DVT Dr. Lehman found during the autopsy.  To support this theory, Dr. Thompson contends that previous orthopedic surgery on Decedent's right knee caused injury to the lining of the vein in the right calf by stretching or tearing the vein that predisposed it to clot formation. (Thompson, pp. 256-58).  An injury to the calf caused by a beating followed by chemical restraints caused the formation of a DVT and the subsequent emboli that killed him. (Thompson, p. 255).  The Court will refer to this theory hereafter as the "right calf theory."

Dr. Thompson's second theory, which he did not mention until page 321 of his deposition, rests on a large bruise found on Decedent's left thigh on autopsy.[2]  He opines that a beating by corrections officers caused the bruise on Decedent's left thigh, that the blow to the thigh was forceful enough to cause a DVT, that it in fact did cause a DVT, and the emboli found

---

[2]This failure to disclose this theory until late in his deposition amounts to a serious violation of Fed. R. Civ. P. 26 discovery requirements.  This is disclosure of expert opinion by ambush.

in Decedent's pulmonary arteries came from the undiscovered thigh DVT and not from the known DVT in the right calf.  (Thompson, pp. 320-21).   The Court will refer to this theory hereafter as the "left thigh theory."  The Court will describe both of his theories in more detail when it examines Dr. Thompson's methodology.

Having outlined Dr. Thompson's opinions, the Court will assess his credentials to testify about the medical issues in this case.  According to his Curriculum Vitae, Dr. Thompson graduated from medical school in 1978 and has practiced much of his career as an emergency room physician.  He is board-certified in emergency medicine.  He also has had considerable experience in family medicine.  Nothing in his CV or deposition, however, shows that he qualifies as a pathologist or has had any training as a pathologist.  He has not done autopsies nor has he had training or experience in performing autopsies nor in examining or dating blood samples, an important analysis performed by the pathologist in this case.  Nothing shows that he has training as a radiologist, a psychiatrist, or an orthopedist.  Moreover, the Court finds little if anything at all about his training or medical practice to show that he has had experience in determining the specific location of a DVT without the assistance of other medical specialists such as a radiologist.

Clearly, Dr. Thompson would qualify under Rule 702 as an expert in a medical malpractice case against a physician practicing family medicine or emergency medicine, but this case does not involve standard of care questions or questions about the diagnosis or treatment of DVT or PE.   When, however, it comes to the question of determining the cause of the Decedent's death, including the location of the DVT and the cause of the DVT, his credentials appear attenuated at best compared to the credentials of a pathologist who regularly performs

autopsies and examines blood samples microscopically.

Because of his lack of experience on key issues, the Court has serious problems with Dr. Thompson testifying in this case about questions that go beyond the scope of his regular medical practice. This specifically includes testifying about the location of a DVT without the expertise of a radiologist or pathologist to assist him. This problem applies to both of his theories.  In other words, he wants to offer opinions in this Court, medical conclusions, that he would not make in his private practice because he recognizes that the specific findings, determining the existence and location of a DVT, fall outside his field of training and experience.  Indeed, he does not draw such conclusions on his own in his routine medical practice.  As he admitted on deposition, when he suspects that one of his patients has a DVT, he asks a radiologist to make the ultimate finding. The radiologist makes the final diagnosis by performing a Doppler study.  (Thompson, p. 204). Furthermore, although he generally understands what causes a DVT, he has offered no testimony to show that as a part of his medical practice he ever decides what caused a DVT in a patient or that he needs to know the cause of the DVT to treat a patient.

The Court can imagine any number of medical specialists who know *in general* about diagnosing and treating DVT and PE, but that does not make them experts in determining the location of a DVT or the cause or etiology of a DVT in a specific case.  As we know from common experience, doctors often do not tell their patients what the Court has characterized as the cause of the cause of an illness.  For example, a virus causes the common cold, but doctors do not tell their patients how or where they caught the virus. The Court could cite multiple examples of this reality of medical care.  In other words, diagnosing a disease is not the same as determining the etiology of the disease.  So, "while the background, education, and training may

11

provide an expert with general knowledge to testify about general matters, more specific knowledge is required to support more specific opinions." <u>Calhoun v. Yamaha Motor Corp.</u>, 350 F.3d 316, 322 (3d Cir. 2003).

This general knowledge problem applies specifically to Dr. Thompson because he cannot use his routine clinical approach with live patients on the dead patient in this case. In describing his clinical examination, he explained: "deep vein thrombosis may present with symptoms of, in most cases, calf pain, swelling and tenderness.  And in some—, it actually can be asymptomatic or no symptoms.  But what we would look for in someone who presented with complaints would be the—swelling, in most cases in the calf areas, and pain and tenderness with—on examination, palpation.  And sometimes there are particular signs, such as the Homans' sign. . . . " (Thompson, p. 28).  He has none of this information available in this case. Dr. Thompson does not treat dead patients, and he cannot perform the standard clinical examination that he uses for live patients to form opinions about a corpse.

On this issue the Court has also considered the practice limitations that Dr. Thompson admitted in his deposition.  Emergency room physicians diagnose and treat patients and have the responsibility for identifying and treating an ailment or illness at its presentation and then deciding how to treat it.  (Thompson, pp. 39-40).  For example, Dr. Thompson admitted that his continuing medical education (CME) study on DVT focused more on treatment than on diagnosis.  (Thompson, p. 28).  As an extern doing emergency room work, his function was on "diagnosing and treating DVT." (Thompson, p. 39). He further described what most emergency room physicians do in most cases: "the emergency physician is the first one to see a patient, and the first one responsible for identification of the ailment or illness that the patient may have prior

to the patient being stabilized and, if necessary, referred to a specialist." (Thompson, p.39).

Very little about his training or experience focuses on determining the cause of a DVT, as opposed to diagnosing and treating the DVT or calling in a specialist to care for the patient. As he further explains, "the emergency physician is responsible, in so many words, is basically responsible for identification of any ailment or illness at its presentation, and from there, making the decision as to how urgent the situation is and how to act or respond to the patient's complaint." (Thompson, p. 40).   Again, on his emergency medicine board exam, he was tested on "all aspects of it . . . the identification of it, the level of suspicion, the diagnosis, and the management of deep vein thrombosis." (Thompson, p. 30).  He does not mention being tested on determining the etiology of a DVT.  On the issue of determining the size of a clot inside the vein, he testified that "it's not generally discussed in that relation.  What's basically discussed is identification, prevention, treatment, and stabilization, if necessary." (Thompson, p. 286). This case does not involve the identification of a DVT in a live patient; it involves the etiology of and location of a DVT in a dead man.

Dr. Thompson conceded that most of his experience has involved diagnosing and treating DVTs, and that he has never conducted an autopsy on a patient who died from a DVT. (Thompson, pp. 203-04).  Consequently, the scope of his practice, as important as it is for patients coming into an emergency room with a life-threatening illness, does not encompass the issues in this case.  Likewise, Dr. Thompson has no experience as an orthopedic surgeon, experience essential to his right calf theory because that theory relies on the unproven, indeed, doubtful fact that Decedent had knee prosthesis surgery at some point in the past.  Nor is he trained as a psychiatrist or has had any experience in treating extrapyramidal side effects caused

13

by psychotropic drugs.

The Court will move to one final and important point, alluded to above, for weighing Dr. Thompson's credentials, especially in regard to the existence and location of a DVT.  By his own testimony, he admitted that he must rely on another medical specialist to determine the location and existence of a DVT. On deposition he explained that when he suspected a DVT, he would ask a radiologist to perform a Doppler study, which the radiologist would read. Indeed, he said that "the radiologist would report that the individual either has a DVT or has had DVT," and that he generally relies "on the radiologist to tell you or confirm that there is a DVT."  (Thompson, pp. 204-05).  Thus, a radiologist typically makes the definitive diagnosis of a DVT in a live patient.  **When asked:**  "**So you generally rely on the radiologist to tell you or confirm that there is a DVT?"  He responded: "Yes."** (Thompson, p. 205).

This admission weighs heavily against him on both his credentials and the validity of the method he used to reach his opinions.  Because even in his own practice, he relies on a radiologist to make the final diagnosis of the location and existence of a DVT, this Court cannot allow him to offer such an opinion in this case, especially as it relates to his left thigh theory. Also, his right calf theory requires proof of a pre-existing DVT in the right calf brought on by orthopedic surgery. He has no radiological data and only minimal autopsy information in this case to support either his right calf theory or his left thigh theory.

To support Dr. Thompson's credentials, Plaintiff's counsel offers two cases that the Court can easily distinguish.  The first case originated in this Court, Flowers v. Wal-Mart Stores, Inc., 2005 WL 2787101 (M.D. Ga. 2005).  In that case this Court allowed a neurosurgeon to testify about causation and damages for one of his patients.  That personal injury case involved a man

who fell from a ladder while working as an independent contractor at Wal-Mart. The Court

allowed his treating neurosurgeon to testify that the fall from the ladder exacerbated plaintiff's

pre-existing condition.  Having represented many neurosurgeons and orthopedists, taken

hundreds of depositions of these medical specialists and read thousands of pages of their medical

records, the Court knew quite well that Dr. Dicks's testimony was the type that neurosurgeons

commonly give for their patients.  Moreover, Dr. Dicks based his opinions on his ongoing care

and treatment of the patient. Dr. Dicks offered the standard testimony based on the standard

treatment and care that neurosurgeons normally provide for their patients. Dr. Thompson did not

do that and could not do that in this case with the Decedent.

Plaintiff's next case involved a medical malpractice claim against a pulmonologist where

plaintiff used a cardio-vascular surgeon as an expert testifying about the standard of care for

using ventilation tubes, specifically, that the defendant pulmonologist extubated the patient too

soon.  The patient had undergone recent heart bypass surgery.   In Dickenson v. Cardio and

Thoracic Surgery of E. Tenn., P.C., 388 F.3d 976 (6th Cir. 2004), the cardio-vascular surgeon

testified that the pulmonologist extubated the patient too early.  A review of the Sixth Circuit

opinion shows that the cardio-vascular surgeon had considerable experience in dealing with

extubation questions, and that the Court of Appeals properly reversed the trial judge's refusal to

allow the cardio-vascular surgeon to testify about the standard of care on extubating a patient.

Again, the Court can easily distinguish this testimony from Dr. Thompson's testimony because

he does not base his opinions on specific medical knowledge of the specific medical question,

and because he does not offer standard of care opinions.

In concluding, the Court notes that Plaintiff's reply brief criticizes some of the opinions of

Defendants' experts. The Court will not address any questions about the Defendants' experts' testimony because Plaintiff failed to file a <u>Daubert</u> motion on those opinions.

Having found that Dr. Thompson does not have adequate credentials to satisfy Rule 702, the Court could stop here and grant Defendants' motion, but the Court will move to the next step of the Rule 702 analysis, because independent of this finding, the Court concludes that Thompson's opinions cannot satisfy a sufficient number of the <u>Daubert</u> and advisory committee tests. Indeed, he can only partially satisfy one of them, but at the same time, he exposes the weakness of his own method. This analysis will show that Dr. Thompson's opinions rest on an unreliable methodology and highly speculative data inconsistent with sound medical practice—just the type of opinions that <u>Daubert</u> sought to keep from a jury.

### The Reliability of Dr. Thompson's Opinions

The Court will evaluate Dr. Thompson's opinions based on the tests or factors discussed in <u>Daubert</u> and the tests recommended in the Rule 702 Advisory Committee's Notes. As part of this undertaking, the Court must find that Dr. Thompson used a valid methodology based on reliable data to reach his opinions. Conversely, the Court must "'ensure that speculative, unreliable expert testimony does not reach the jury' under the mantle of reliability that accompanies the appellation 'expert testimony.'" <u>Rink v. Cheminova, Inc.</u>, 400 F.3d 1286, 1291 (11th Cir. 2005) (quoting in part <u>McCorvey v Baxter Healthcare Corp.</u>, 298 F.3d 1253, 1256 (11th Cir. 2002)).

In <u>Daubert</u>, the Supreme Court stated that the trial court should do a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue. <u>Id.</u>

at 592.  The Supreme Court offered several non-exclusive tests that the Court will consider one at a time.

**1) Can the expert's theory or technique be tested, and has it been tested?**  Id. at 593**.**

Dr. Thompson failed to offer any testimony about the testing or possibility of testing either of his theories.  The Court, however, understands quite clearly that **he cannot test them** because he does not have the training or skill to do so. He points out nothing in the literature that deals with the specific questions in this case. For example, Dr. Thompson may be completely accurate when he quotes the medical literature which says that DVTs occur in 50%-70% of patients following knee surgery.  That, however, helps very little when no firm evidence exists that Decedent ever had knee surgery.

This lack of testing and his inability to test is an especially serious failure when a pathologist can easily test the existence and location of a DVT by autopsy. Dr. Thompson cannot test his theory on a dead patient without the help of a pathologist or on a live patient without the help of a radiologist because he lacks the requisite skill and training. Thus, he fails this test.

**2) Has the theory or technique been subject to peer review and publication?**  Id.

Dr. Thompson has offered nothing to show that either of his theories have been peer reviewed or published.  He does not contend that some medical panel has reviewed and approved his opinions.  He has not offered his opinions for publication.  He did discuss the certain medical journals that he had reviewed, which does not come under this question, but the Court will make some observations about his use of the medical literature.

Although he testified that he reviewed some medical literature in reaching his conclusions, he offered nothing specific from that review about either his right thigh or left calf

17

theory. General medical knowledge about diagnosis and treatment of DVT does not reach the specific issues in this case involving the cause of the cause or etiology of Decedent's DVT. The Court does not find general references to the medical literature very convincing and would much prefer to read the literature to get a complete picture of what it actually says.

Dr. Thompson could easily have brought copies of the literature to his deposition to attach as an exhibit or at least provided the medical citations.  In fact, Fed R. Civ. P. 26(2)(B)(ii) requires this information in the initial expert report. It requires the disclosure of "any data or other information considered by the witness in forming them [opinions]."  Moreover, this helps the Court  avoid the problem that arose with one of the experts in  McClain v. Metabolife, 401 F.3d 1233 (11th Cir. 2005), where, after reviewing the articles relied upon by plaintiff's expert, the court found that they did not support the expert's opinions. (Id. at 1244).  The United States Supreme Court set the precedent for such a review of the medical literature the experts relied on in Gen. Elec. Co. v. Joiner,  522 U.S. 136, 144-47 (1997).  That court also found that the studies did not support the experts' opinions.

In light of this failure, combined with only general information from the literature, the Court cannot give much credence to Dr. Thompson's testimony based on the literature.  This case involves very discreet medical causation questions, not questions about diagnosis and treatment.

He has failed to prove that his opinions have been published or peer reviewed.  Thus, he fails this test.

**3) Is there a known or potential error rate?** Daubert, 509 U.S. at 594.

Dr. Thompson offered no testimony about any known or potential error rate. He did testify, however, that 95% of DVTs begin in the calf.  (Thompson, p. 344 ). This certainly

undermines his left thigh theory, which consequently has only a 5% chance of being correct, even without its other limitations. He fails this test because he has not offered a known or potential error rate for either of his theories.

**4) Is the theory or technique widely accepted?**   Id.

Dr. Thompson offered no testimony about a wide acceptance or any acceptance at all of either of his theories.  He gave no indication of how widely accepted it is that a tattoo can be a bruise or that treating extra-pyramidal side effects with a widely used over-the-counter drug, benadryl, can amount  to "chemical constraints," an issue that the Court will deal with later. He has offered no testimony about the error rate for the likely cause of death from an unknown DVT in the thigh when there is a known DVT in the calf.  The Court could but will not elaborate on this further.  Dr. Thompson gave no testimony to satisfy this test.

Before moving into the next series of tests, the Court would observe that the Daubert tests generally fit better in cases involving strictly scientific questions, rather than for the medical questions in this case. Simply because an expert fails these tests in a medical question case does not result in the exclusion of his testimony.  On the other hand, had Dr. Thompson "passed" these tests or some of them, the Court would weigh that favorably in admitting his opinions.  The Court, however, believes that the tests outlined in the advisory committee's notes work much better in a case like this.

The Advisory Committee recommends five tests that the Court has repeatedly found helpful in ruling on expert questions.  Again, the Court will discuss these one at a time.

**1) Whether the expert is proposing to testify about matters growing naturally and directly out of research he has conducted independent of the litigation, or whether he has**

**developed his opinion expressly for purposes of testifying.**

Dr. Thompson clearly fails this test.  His testimony did not naturally and directly arise out of research conducted independent of the litigation.  He developed his opinions solely for the litigation.  But more importantly, he admitted on deposition and shows on his resume that he works as a consultant for Plaintiff's counsel. He also has testified for him on three other occasions. (Thompson, pp. 172, 182).

The obvious thrust of this test aims at the expert's independence.  This ongoing professional relationship, this serving as a consultant, makes such independence remote at best. Thus, he fails this test.

**(2) Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion.**

The Court will alter this test slightly by replacing the word "premise" with the word "fact." The new test reads: whether the expert has unjustifiably extrapolated from an accepted fact to an unfounded conclusion.  This inquiry focuses on Dr. Thompson's left thigh theory and goes directly to the reliability of his methodology.

Dr. Lehman found a large bruise on Decedent's left thigh.  From that known and rather simple fact, Dr. Thompson concludes that a PE from an unsubstantiated DVT in the left thigh killed Decedent.  To analyze this opinion, the Court will consider the unproven facts that Dr. Thompson had to assume to reach this conclusion.

The Court will outline some of these necessary but unproven suppositions: (1) that a corrections officer kicked Decedent in the left thigh, (2) that the kick occurred at GD&CC, (3) that the kick caused the bruise, (4) that the kick was forceful enough to cause not only a bruise but also

a DVT, (5) that the kick did in fact cause a DVT, (6) that the bruise did not occur from some other injury, (7) that the DVT in the thigh embolized and killed Decedent, (8) that the known DVT in the calf did not embolize and kill Decedent, and (9) that the DVT occurred in the thigh, contrary to the 95% likelihood that it would occur in the calf.  The failure of all these unsupported suppositions or any one of them renders this theory inadmissible.  Goebel, 346 F.3d at 992.

This theory may qualify as some sort of medical casuistry but not as medical science.  It does qualify, however, as a classic example of the *ipse dixit* of an expert.  As the Supreme Court explained in Kuhmo Tire, "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." Kuhmo Tire, 526 U.S. at 157.  Simply stated, just because someone has a medical degree or is board-certified in emergency medicine, that does not authorize him to testify about a theory not based on a solid foundation. As Judge Posner explained: "a district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculations offered by a genuine scientist." Rosen v. Ciba-Geigy Corp., 78 F.3d 316, 318 (7th Cir. 1996). Here we have a genuine doctor presenting unsupported medical speculation.  He cannot just make up facts to support his opinions—he cannot offer opinions that are "educated guesses dressed up in evening clothes." Siharath v. Sandoz Pharm. Corp., 131 F.Supp 1347, 1373 (N.D. Ga. 2001).

It is patently obvious that Dr. Thompson cannot support this theory with sufficient evidence in the record.  Indeed, the theory falls in the category of evidence that fails because it amounts to nothing more that what an attorney could argue in closing argument. Frazier, 387 F.3d at 1262.  Consequently, the Court finds that there is "simply too great an analytical gap between

the data and the opinion proffered" on the left thigh theory. Gen. Elec. Co., 522 U.S. at 146.  Too much speculation—not enough fact.

This theory also smacks of the *post hoc ergo propter hoc* fallacy.  This fallacy relies on a temporal relationship rather than a scientific relationship to an injury.  The fallacy holds that "after this, because of this."  McClain, 401 F.3d at 1243.   In practical terms the fallacy works out in this case as: Decedent died after he suffered a bruise on his thigh; therefore, what caused the bruise killed him.

For many reasons, Dr. Thompson's left thigh theory does not work but chiefly because it relies on too much speculation and a lot of unproven data. Speculation and unproven data do not make for a reliable methodology. Again quoting Judge Posner: "The courtroom is not the place for scientific guesswork, even of the inspired sort.  Law lags science; it does not lead it." Rosen, 78 F.3d at 319. His left thigh theory does not satisfy this test.

In conclusion, Dr. Thompson's left calf theory suffers from both a factual gap and a medical gap, with the later being more serious.  He does not really have any evidence of a beating that inflicted injury to Decedent's thigh.  But even if he did, he still cannot close the medical gap with all the speculation that he has conjured up to cover his theory.

The Court will now shift to an analysis of Dr. Thompson's right calf theory.  In this theory he does not extrapolate from an accepted premise or an accepted fact to an unfounded conclusion. Rather, he turns an obvious fact into fiction and reaches an unfounded conclusion.  This criticism involves his argument that the tattoo Dr. Lehman found on Decedent's right calf was actually a bruise.

Although the Court has felt more than once that Dr. Thompson was testing the Court's

22

credulity, nothing surpasses this medical mockery.[1]  But only by this opinion can Dr. Thompson

implicate Defendants in Decedent's death with his right calf theory. Without trauma to the calf,

Dr. Lehman's opinion that Decedent died of natural causes carries the day. No trauma—no

wrongful death.  (The Court's opinion on this theory does not rest on a credibility assessment.  It

rests on the  autopsy report.)

Dr. Lehman found a tattoo on Decedent's right calf.  In the autopsy report, he said, "[a]

tattoo on the right calf laterally appears to include a crescent-shaped moon and an inscription that

is not completely legible."  (Thompson, p. 242, quoting from Lehman's autopsy report).  The fact

that Lehman clearly described a tattoo and merely could not read the inscription, combined with

the fact that he could read the inscriptions on the other tattoos on Decedent's body serves as Dr.

Thompson's rationale for saying that the tattoo was really a bruise. Of course, he did not call Dr.

Lehman to inquire about this, nor did he look at a photograph of the tattoo.  (Thompson, p. 243).

He did not exercise a doctor's ordinary diligence because he made an essential assumption without

seeking further information known by another doctor.  (This is a Daubert motion not a motion for

summary judgment, so the Court does not have to take the view most favorable to Plaintiff.

Plaintiff has the burden of proof on his expert's opinions, methodology, and the sufficiency of the

data he uses to reach his opinions. Maiz v. Virani, 253 F.3d 641,664 (11th Cir. 2001)).

But the problem goes beyond what the pathologist saw with his own eyes and what even a

lay person can identify, compared with Dr. Thompson who never saw the tattoo or even looked at

a photograph of the tattoo.  The further refutation of this conclusion that part of a tattoo is really a

---

[1]The Court reached this conclusion before reading defense expert Dr. Sperry's comment on this point. He said: "that falls under the categories of one of the most preposterous things I have every heard or encountered in my career. That is ignorant . . . that is outrageous."  (Dr. Sperry, p.45).

bruise arises from the other autopsy findings.

Under "Internal Examination" in the autopsy report, Dr. Lehman gave the following description: "Examination of the subcutaneous soft tissues, deep musculature, and deep blood vessels of the calves reveals what appears to be acute thrombosis of large veins within the right calf.  The caliber of the apparent thrombus is 5 mm in diameter.  <u>The surrounding soft tissue is without hemorrhage or other identified abnormality</u>."  (Dr. Lehman's autopsy, p. 2) (emphasis supplied). This reflects that when Dr. Lehman examined the tissues beneath the skin, he did not find any evidence of injury to the subcutaneous tissues. He also did not find a torn or damaged vein. This is perfectly consistent with a tattoo in the calf but not with a bruise that injures the tissue below the skin or a vein that had been injured either recently or in the past.  Also, nothing from the autopsy shows a connection between the "bruise" and the DVT, except that the bruise is somewhere on the calf, and the DVT is in a vein within the calf.  The data refutes Dr. Thompson's wild suggestion that the tattoo is a bruise.  This also destroys his right calf theory.

In conclusion, the Court will make one final observation about Dr. Thompson's two theories and the amount of force required to cause a DVT in the calf or the thigh.  Dr. Thompson testified on his deposition that to cause a DVT, a blow to the extremity must be hard enough to tear, rupture, or separate the vessel wall itself.   (Thompson, p. 270). The record does not support this essential proposition.  Nothing in the record shows a torn, ruptured, or separated vein in either Decedent's calf or left thigh.  His speculation and unfounded assumptions reduce the value of Dr. Thompson's opinions to "the level of gossamer."  <u>The Am. Bearing Co., Inc. v. Litton Indus., Inc.</u>, 729 F.2d 943 (3d Cir. 1984).  This Court, following the dictates of <u>Daubert</u>, will not let a jury get caught in this cobweb of speculation.

**(3) Whether the expert has adequately accounted for obvious alternative explanations.**

Dr. Thompson offered some explanation for why Dr. Lehman incorrectly concluded that Decedent died of natural causes. Dr. Thompson did not criticize the autopsy. He generally accepted Dr. Lehman's findings on autopsy but not his conclusion that Decedent died of natural causes. Dr. Thompson attacked Dr. Lehman's theory with two arguments. First, Decedent was too young to die a natural death, so the trauma killed him. And second, that Decedent's medical records showed no evidence of a blood disorder that could account for the DVT. He specifically testified, however, that he could not exclude that the clot that killed Decedent may have come from his right calf. (Thompson, p. 335). Thus, although he passes this test by partially accounting for Dr. Lehman's opinion about the cause of death, not being able to exclude that the clot that killed Decedent came from the right calf undermines the reliability of his own methodology.

**(4) Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting.**

Dr. Thomson admitted on his deposition, as discussed in detail above, that when dealing with his patients who he expects have DVTs, he commonly calls on a radiologist to make the final diagnosis. In other words, he requests a consult. Doctors commonly request consults with other specialists in complex cases or on cases that require a test or examination that the treating physician does not perform. Dr. Thompson did not consult with a specialist in this case.

Although he typically uses a radiologist to make the final diagnosis of a DVT in one of his patients, he had no radiographic data in this case. Moreover, the Court cannot conclude that because he relied in part on the pathologist's autopsy that the pathologist served as a consultant.

25

Dr. Thompson reached conclusions that conflicted with the pathologist's conclusions, and he contradicted Dr. Lehman's finding of the tattoo on the right calf. Moreover, he reached conclusions about Decedent's left thigh not even remotely connected to the autopsy findings. Also, he did not call Dr. Lehman about the possibility of the trauma to the left thigh causing a DVT or any other aspect of Lehman's findings. (Thompson, p. 243). He also did not look at the photographs of the tattoo. He did not request them. (Thompson, pp. 243-44). He concluded that Decedent suffered a severe blow to his left calf, while Dr. Lehman found only "minor traumatic injuries." (Autopsy, p. 4). But his failure on this test goes deeper.

Dr. Thompson's right calf theory relies on the fact that Decedent had previous surgery on his right knee. He admitted that he wanted the medical records on the knee surgery. He admitted that the failure to get the records sidetracked him. (Thompson, p. 230). He recognized the importance of these records, but he failed to get them. Yet this failure did not stop him. He still rested his opinion on an unproven, indeed, the very unlikely fact that Decedent had previous knee surgery—but not just any knee surgery—a knee replacement on a 27-year old whose father knew nothing about it.

The Court will now quote at length from Thompson's deposition on the critical point about Decedent's history of knee surgery.

> Q. Okay. Did you ask for any documentation regarding Mr. Clarke's medical history aside from what you got from the attorneys in this case?
> A. Well, I was kind of sidetracked. I did ask that we find out about his history of his right knee, and the information from the father is that he is not aware of his having any problems with his right knee.
> And with that, I— I didn't have any more information to — to ask about.
> Q. What did the right knee have to do with it?
> A. Well, in reviewing the information, I had noticed that on several evaluations and examinations by Mr. — of Mr. Clarke, that he had given a history

of right knee surgery, and I wanted to get further information on the surgery.

    Q.  Who did you ask for that additional information?

    A.  Well, I asked the attorneys and they asked the father, my understanding is, and the father said that he wasn't aware of anything.

    Q.  And that was the extent of your investigation?

    A.  That was it, yes.

(Thompson, p. 229-30).

Dr. Thompson explained that he saw in three or four locations in Decedent's medical records that Decedent claimed to have a plastic knee or a knee reconstruction. Yet he admitted that the medical records also contained a note that Decedent "marked everything on here because [he] was mad." (Thompson, p. 236). In other words, he marked knee surgery because he was mad. Even with this admission, Dr. Thompson still accepted this as one of two essential bases for his right calf theory. He thought that previous knee surgery was important because "in the sense of development of deep vein thrombosis, knee surgery, knee procedures can result in deep vein thrombosis in 50 to 70 percent of the cases as far as the literature explains it. And I felt that would be something significant." (Thompson, p. 231). This is another one of Dr. Thompson's general medical statements based in the literature that has no tether to the facts in the case. He cannot base an opinion on vague, unclear, and uncertain data. He would not do this in his normal practice. Doctors do not rely on vague and uncertain information. That is why they order tests like x-rays, CT scans, and lab studies.

Dr .Thompson admits, "I did not find any evidence that he had had — I didn't find a report of the surgery, any detailed information — on it besides his history." (Thompson, p. 232). But he notes that the medical examiner did find "a 1.5 inch long surgical scar on Decedent's right knee." (Thompson, p. 232). The autopsy does not call it a surgical scar. (Autopsy, p. 2). Furthermore, Dr. Thompson admits that he does not even know for certain if it was a surgical scar. (Thompson,

p. 258). Also, under his theory, the knee surgery was not just any surgery, it was a knee replacement, cutting out bone and putting a prosthesis in its place. Even a lay person familiar with knee prostheses knows that an orthopedist cannot put a knee prosthesis in through a 1.5 inch incision.

Based on this flimsy evidence, he launches off into rampant speculation, and opines

that if [Decedent] had some procedure done, there was some damage done to the — the deep veins of — of that leg. And again, in the literature, it states that in most cases they will develop a deep vein thrombus, or a thrombosis, and usually after surgery those are treated right away with the expectation of a deep vein thrombosis forming. So he probably, in my opinion within a reasonable degree of certainty, developed a deep vein thrombosis, had it treated after the procedure with blood thinners, probably for six months, which is the usual length of time for an acute treatment — treatment of an acute deep vein thrombosis, and after that, he may not have taken any more medication for it.

(Thompson, p. 233). He further stated

that that stays. The deep vein thrombosis stays. The damage to the vessel stays there. An area of the clot or of the thrombosis will open up and allow more venous — or blood to flow through the venous — or blood to flow through the vein. Maybe definitely not as much as is did before the damage to the vessel, but there would be eventually some opening what that does, though, is it leaves a rough area for platelets to attach if the blood isn't flowing fast enough. It doesn't — disappear, but what does happen is that over a period of time, the vessel re-canalizes.

(Thompson, pp. 232-243).

This amounts to nothing less than wild speculation without any reliable support in the medical records. He has no training as an orthopedist. He makes an extensive diagnosis of a previous medical problem without any record to back it up, and even when he said that he wanted the records and did not get them, that did not stop him from offering the opinions. This is not a medical opinion; it is a medical fantasy fashioned out of wishful thinking. (This speculation also

provides the foundation for Thompson's opinion that placing Decedent in restraints caused the blood to slow down through the vein in the area of the previous damage.  (Thompson, p. 234)).

Now the Court will examine his left thigh theory to see if he reached his opinions on this theory with the same care he would have used in his regular practice.  But here again, he piles speculation on speculation to reach an opinion without medical support.

The foundation for this opinion rests on a bruise on Decedent's left thigh found by the pathologist on autopsy.  He takes these two facts and decides that Decedent died of emboli from the left thigh. Yet he admitted that he had no direct, objective evidence to show a DVT in the left thigh.  As he said, "the only evidence is the end result, which was pulmonary embolism." (Thompson, p. 328). He further said that it was "a possibility that his left femoral vein was damaged, and it just wasn't identified."  (Thompson, p. 342).  He never saw the photograph of the left thigh, and the photograph hardly makes the case for an injury so severe that it would damage the femoral artery. (See attachments to Dr. Sperry's deposition.)  Once again, he returns to the *post hoc ergo propter hoc* fallacy. Based on his explanation of his clinical practice on a live patient, he would never make a diagnosis of DVT simply based on these two facts.  If he would not do it in his regular practice, he cannot offer such lame opinions in federal court. The Court will not allow the wild speculation that enables him to make the great leap of faith that a bruise in the thigh equals death from a PE.  (Thompson, p. 329-30).

**(5) Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.**

By now and based on the previous discussion, it is obvious that an emergency room physician does not have the training, skill, or experience to offer the type of opinions that Dr.

Thompson offers in this case.  Without belaboring the question, the Court finds that he is not qualified to give the specific opinions in this case to support Plaintiff's wrongful death claim. He cannot even find a DVT or make a diagnosis of a DVT in his medical practice without a radiology consult in a live patient. He cannot use his standard clinical skills on a dead patient.  Thus, he fails this test.

Although the Court has found that Dr. Thompson's opinions fail all but one of these tests recommended by the advisory committee, the Court finds that tests 2, 4, and 5 deserve the most weight because they focus on the sufficiency of the data and the reliability of his methodology. Had he failed even two of these three tests, the Court would still have excluded his testimony.

Having completed this analysis and finding that Dr. Thompson fails all but one of the tests, and having concluded that he did not employ reliable methods and based his opinions on inadequate data, the Court could conclude this order and grant Defendant's motion.   The Court, however, will now consider another important element of Rule 702 and the Daubert analysis.  The expert's opinions must assist the trier of fact.  The Court finds that a number of Dr. Thompson's opinions do not assist the trier of fact because they do not connect factually to the case.  They do not fit.  Id. at 591.

### *Assisting the Trier of Fact*

Dr. Thompson made an important concession when he agreed with Dr. Lehman's opinion that the thrombus in the right calf was less than three days old.   (Thompson, pp. 278, 285).  Dr. Thompson made another important concession when he testified that based on a three-day old clot, the date of the injury that caused the thrombus would have occurred about six days before Decedent's death on April 19.  (Thompson, p. 298).  He also testified that any trauma that

occurred more than a week before his death would **"much less likely"** be the cause of death. (Thompson, p. 299) (emphasis supplied). Finally, he cannot pinpoint any specific trauma that caused the DVT to develop.  (Thompson, p. 301).

This testimony effectively limits Decedent's life-ending injury to one week before his death.  Moreover, testimony based on **probability** assists the trier of fact, but **"much less likely"** does not qualify as a description of probability.  The preponderance of the evidence standard controls Plaintiff's burden of proof in this case.  Dr. Thompson's testimony restricts medical causation—the cause of Decedent's death—to approximately one week before his death. Also, Dr. Thompson admits that he does not know if anyone beat Decedent after he returned to GD&CC from Autry shortly before his death.  (Thompson, p. 292).  His testimony does not help the trier of fact on the medical importance of anything that occurred during the period earlier than a week before his death.  Moreover, he has no evidence that ties his opinions to any of the Defendants in this case.

On another issue, part of Dr. Thompson's causation opinions rely on the fact that the use of 5-point restraints and "chemical restraints" on Decedent contributed to the development of Decedent's DVT.  This immobilization contributed to the formation of the clot.  (Dr. Thompson, p. 289).  Dr. Thompson  testified  that Decedent was placed in 5-point restraints twice at Autry, the last time on April 7 before he returned to GD&CC.   (Thompson, p. 293). Even if the restraints at Autry contributed to the development of the DVT, that does not impact the Defendants' liability in this case. None of them worked at Autry.

He also claims that Decedent was in "chemical restraints" at GD&CC two to three days before his death, which also contributed to the development of the DVT and his death.

(Thompson, pp. 299-300).  Decedent, who had a psychiatric disorder and took psychotropic medicines for that disorder, developed extrapyramidal side effects from taking his medicine. (Thompson, p. 318).  Extrapyramidal side effects are a known side effect of these drugs.  To control this serious medical problem, someone at GD&CC prescribed benadryl for him.

The Court notes several problems with Dr. Thompson's opinions related to his "chemical restraint" theory. First, he admits that a psychiatrist can best assess the prescription of drugs for this problem. He has no psychiatric training.  Second, benadryl, a widely used drug, has been sold over the counter for years, and both adults and children take it for allergy problems. Third, although benadryl has sedative qualities, the Court finds it most dubious to call treatment with benadryl a chemical restraint.  The record reflects that Decedent was sedated, benadryl causes sedation, and the sedation may have affected his mobility.  But to call the medical treatment of a known drug complication  a chemical restraint, which implies disciplinary action and not medical attention, does not rest on any valid methodology, has no support in the medical literature, and cannot serve as an opinion in this case. Moreover, he cannot attach prescribing this drug to any Defendant in this case.  (Dr. Thompson, p. 319). Finally, not treating the extrapyramdial side effects would at least authorize a medical malpractice action, if not an Eighth Amendment conscious indifference claim.[4] Dr. Thompson's testimony on restraints does not assist the trier of fact.

As noted above, Dr. Thompson's testimony does not assist the trier of fact to decide some of the important medical questions in this case. Even by his own testimony, the trauma had to occur within six to seven days before his death. While on direct examination by Plaintiff's

_____

[4]Years ago, the Court spent a week in trial defending a medical malpractice claim based on the failure to treat a patient's extrapyramidal side effects.

counsel, Dr. Thompson attempted to overcome the impact of this important limitation, but the effort failed because his testimony was too speculative. This testimony involves his left calf theory.

Plaintiff's counsel asked him if the beating in March could have contributed to the blood clot that released and killed him. Dr. Thompson responded that "with the vessel being the size it is, the femoral vein is one of the largest . . . some minor damage to it **could** easily develop a buildup of clotting material at a slow rate over a period of time that **could** coincide with acute, subacute, or even chronic formation of - - thrombus . . . The prior injury **could** have caused the development of  - - a thrombus or a clot."  (Thompson, pp. 323-24) (emphasis supplied).  "With a bruise that size, damage to the vessel wall **could** occur."  (Thompson, p. 342) (emphasis supplied).  "There's a **possibility** that his left femoral vein was damaged and it just wasn't identified."  (Thompson, p. 342) (emphasis supplied).  He also admitted, however,  that the bruise could have come from an injury by an inmate or Decedent injuring himself.  (Thompson, p. 336). He also admitted that he did not find anything in the medical records that indicated an injury to his left thigh.  (Thompson, p. 350).  Finally, he admitted that he had never seen a DVT in the left thigh before.  (Thompson, p. 348).

Although the Court has already ruled out the left thigh theory, this "could, could, could" testimony and "possibility" opinions add nothing to assist the jury. "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable testimony."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).  Furthermore, this "could, could, could" testimony resembles the type of equivocating testimony that the court ruled out in

McClain, 401 F.3d at1240.  "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."  Daubert, 509 U.S. at 592.  Dr. Thompson cannot offer a valid scientific connection, and he cannot offer a valid factual connection.  His testimony does not assist the trier of fact.

## CONCLUSION

The Court has found that Plaintiff's expert's testimony has failed all three of the broad categories of proof required to satisfy a Daubert challenge.  Any one of the three failures would have sufficed to exclude Dr. Thompson's testimony.  Therefore, the Court **GRANTS** Defendants' Joint Motion to Exclude Plaintiff's Expert Testimony.

**SO ORDERED**, this 8th day of July, 2009.


S/ C. Ashley Royal_____
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE